## DECLARATION EXHIBIT PAGE INDEX

Exhibit No.                                                                 Begins at Page

Exhibit 1                                                                                1

STATEMENT OF

JON W. DUDAS

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY
AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE

SUBCOMMITTEE ON COURTS, THE INTERNET AND INTELLECTUAL PROPERTY
COMMITTEE ON THE JUDICIARY
U.S. House of Representatives

"USPTO Oversight Hearing"

FEBRUARY 27, 2008

## Introduction

Chairman Berman, Ranking Member Coble, and Members of the Subcommittee:

Thank you for this opportunity to appear before you to discuss the United States Patent and Trademark Office's (USPTO) operations, programs and initiatives.

I first want to take this opportunity to thank you Mr. Chairman and your colleagues on both sides of the aisle for your continued support for the USPTO and its 8,500 employees. We are especially pleased that the Administration and the Congress have worked to ensure that the USPTO has access to all anticipated fee collections. The President's budget for FY 2009 continues this full-access to fee collections for the fifth consecutive year. We expect to receive $2,075 million in fee revenue in 2009, which is almost an 8 percent increase in resources over what we expect to collect in 2008.

Full access to fees has provided, and will provide, the resources to continue our record hiring of patent examiners and to streamline our processes to achieve maximum operational efficiency. We plan to hire an additional 1,200 patent examiners each year and will continue to expand our award-winning telework programs and otherwise work to make the USPTO an "employer of choice." Further, we will continue to improve electronic processing and communications with applicants, encouraging them to do business with the USPTO via the Web. Also, we will expand our efforts to protect American intellectual property domestically and abroad by providing IP training for

Exhibit 1
Page 1

foreign officials and through ongoing work with international IP offices to cooperate on a wide range of issues.

Mr. Chairman, as we look to the future, we will make every effort to improve on our successful record in fiscal year 2007. Our patent examiners completed over 362,000 patent applications in 2007, the largest number ever, while maintaining for the second year in a row an examination compliance rate[1] of 96.5 percent, the highest in a quarter of a century. The allowance rate for patents is currently 44%. This is in contrast to allowance rates in excess of 70% just eight years ago.

Also, over the past few years, the percentage of Board of Patent Appeals decisions in which the examiner is affirmed or affirmed in part has increased from 51% to 69%. Finally, since the pre-appeal brief program was established in midyear 2005, the percentage of applications reviewed under the program in which the examiners action is deemed correct has increased from 45% to 56%.

On the trademark side, we also processed a record number of applications in 2007. USPTO trademark examining attorneys completed work on nearly 324,000 classes. Nearly 96 percent of first actions and more than 97 percent of final actions met statutory and compliance rates for quality of decision making and writing, the highest levels ever achieved. The trademark organization has seen significant production and productivity gains in the past two years.

All in all, fiscal year 2007 was another banner year for the USPTO. We met 90 percent of the performance goals established under the Government Performance and Results Act of 1993.

Mr. Chairman, we fully intend to build on our successes. Our primary strategic goals over the next several years are to optimize patent and trademark quality and timeliness and improve intellectual property protection and enforcement domestically and abroad. I would like to discuss our ongoing, planned and envisioned initiatives intended to achieve our goals.

## Patent Initiatives - Human Capital

The primary factor influencing patent quality is the expertise of our examining corps. Attracting, hiring, training, and retaining the high performing examiners who are critical to meeting our goals is a multi-faceted effort that includes competition for some of the most talented and recruited individuals in tomorrow's work force. We have and will do everything we reasonably can to make sure we offer examiners and all our employees the kind of workplace, benefits and opportunities that will keep them on board for years to come.

---

[1] The patent allowance compliance rate is the percentage of applications allowed by examiners with no errors after being reviewed.

With respect to addressing our patent backlog challenges, we should note that the recent Government Accountability Office report, "Hiring Efforts Are Not Sufficient to Reduce the Patent Application Backlog," draws a conclusion consistent with what the USPTO has been saying for nearly 5 years -- hiring alone simply is not the answer to the growth of filings and complexity in the patent system. Accordingly, our initiatives go beyond hiring to include a wide range of efforts to promote quality and efficient processing and make the USPTO an "employer of choice."

### 1. Hiring Patent Examiners

With full access to our fee collections, the USPTO hired 1,215 patent examiners in FY 2007. We plan to hire 1,200 patent examining professionals each year through 2013.

### 2. Recruiting

The USPTO's recruitment efforts are strong and nationwide in scope. Planning efforts have culminated in targeted TV, print, radio and Internet banner advertising, and developing a brand image, "Examine the Possibilities." Additionally, we have increased career and job fair participation and on an annual basis we participate in over 150 events throughout the country. We also offer recruitment incentives (up to $9,900 per year for four years for hard-to-fill computer and electrical engineering positions) for all examiners.

We continue to explore partnerships with universities to offer intellectual property courses to science and engineering students, develop an internship program and train students in intellectual property to create a ready pool of potential examiner candidates.

### 3. Making USPTO an "Employer of Choice"

Continuing to attract and retain the finest public servants is a growing challenge. Our employees are at the heart and soul of our intellectual property system, and we need to do everything we possibly can to ensure they have an environment of trust, respect and opportunity.

The USPTO has developed and implemented a variety of workplace-friendly, family-friendly initiatives that have earned the USPTO recognition by *Business Week* magazine as one of the best places in America to launch a career and to round out one's career. The USPTO has also been lauded by *Washington Families* magazine as one of the best places in the Washington area to work if you have a family. We are proud to offer a wide range of benefits from an on-site daycare center, to a modern fitness center, to reimbursement of law school tuition for examiners. We will expand and improve our workplace offerings and attributes to promote the USPTO's image as an "employer of choice."

### 4. USPTO Telework -- the "Gold Standard"

As we hire over 1,200 patent examiners a year, much of our human capital focus is on telework programs which help recruitment and retention efforts, improve work/life balance, minimize commuting time, maximize examiner productivity and allow us to more efficiently manage our space requirements.

Over 1,000 examiners have joined our recently implemented Patent Hoteling Program (PHP). The PHP was developed using the very successful Trademarks telework program model and is a voluntary program that provides patent examiners the ability to work from home with complete on-line access to USPTO resources. We plan to add 500 more examiners to the hoteling program each year for the next several years. The goal of the hoteling program is to change the boundaries of the old workplace patterns allowing for decreased commute time, a more efficient use of office space, and even a more balanced lifestyle for our employees. This all translates into increased employee productivity and satisfaction, as well as higher employee retention. It should be noted that 83% of our hotelers reported an increase in morale and 87% strongly or somewhat agreed that they would be willing to work more years at the USPTO because of the hoteling program.

On a more long-term basis, we hope to create a workplace where an examiner can be successful from anywhere. In this regard, we are currently engaged in consultations with Administration officials and members of Congress to address relevant issues concerning duty station requirements and travel regulations. Resolution of these issues would permit current hoteling employees to request to live in geographical locations far removed from our headquarters, thus enhancing our ability to retain high quality professionals.

### 5. Pay and Retention

All patent examiners received a 7% special pay rate increase in November 2006. With the January 2008 across-the-board increase for other Federal employees, in February we submitted a request to the Office of Personnel Management for an increase of 2% to the special pay table for patent examiners. The special pay coupled with the recruitment incentives has assisted the USPTO in reaching our hiring goals.

The USPTO expects to increase productivity in Patents by offering examiners more opportunities to determine when and how they do their work, and achieve higher bonuses. The USPTO is piloting a voluntary flat goal program for patent examiners that builds upon the successful system in Trademarks and moves production away from an hourly-based system. Highlights of the program include awards of up to $5,000 per quarter; flexibility in how work is done; and a predetermined amount of work based on grade and docket. Under the year-long pilot (April 2007 - April 2008), examiners may earn larger, quarterly bonuses for every application examined above a particular target goal. Early indications are that participants prefer the per-application bonus as opposed to the present productivity award structure and enjoy the flexibility of choosing when and how to do their work. The USPTO will evaluate the results of the pilot and incorporate that information into future planning.

In 2006, USPTO management submitted proposals to the Patent Office Professional Association union representatives for a new collective bargaining agreement that would replace a previous agreement negotiated in 1986. Proposals include enhanced patent examining monetary awards as well as a stand-alone quality award. Negotiations on those proposals continue.

### 6. Patent Examiner Attrition

The USPTO agrees with the recent GAO report which concludes, in part, that patent examiner attrition is an important matter deserving further analysis and attention. It is clear that patent examiners are critical to our system of protecting intellectual property and driving American innovation. We have achieved notable successes in examiner retention efforts and face various challenges in that context that have not yet been fully explored and evaluated.

In reviewing patent examiner attrition, and otherwise continuing to promote appropriate initiatives to maximize the efficiency and productivity of examination, we must recognize a number of relevant facts:

1. The USPTO's attrition rate is lower (8.5%) than the average attrition rate for Federal workers (11.2%).
2. The average attrition rate for USPTO patent examiners with 0-3 years experience is 15.5%. The average attrition rate for USPTO patent examiners with 3-30 years experience is 3.95%.
3. The attrition rate of patent examiners with 0-3 years experience, though measurably higher than the rest of the patent corps, appears to be well below the attrition rate experienced by similarly situated entities hiring more than 1,000 engineers in a year.
4. Examiners with the highest production requirements have the lowest attrition rates, and the examiners with the lowest production requirements have the highest attrition rates. In fact, 70% of all work in FY 2007 was done by examiners with 3 or more years of experience who exceeded their production goals by an average of 8% and had an average attrition rate of 3.95%.
5. 60% percent of all patent examiners exceeded their production requirements by at least 10% in FY 2006.

2007 proved to be a year where our targeted strategies focused on first-year attrition were dramatically successful. First year attrition is the highest attrition year for nearly all businesses and has historically averaged 20% at the USPTO. In 2007, we reduced that to 15%, and in some areas targeted for retention bonuses, we cut it in half. We have less than two years of data, but our combination of improved recruiting, training and retention efforts -- focused in the high risk areas -- has led to strong positive results.

### 7. Training Patent Examiners

5

Exhibit 1
Page 5

In fiscal year 2006, USPTO established a new university-style training program to graduate new-hire examiners with the ability to work with reduced oversight thereby reducing the art unit training burden faced by Supervisory Patent Examiners (SPEs). The training program consists of classes of approximately 130 students, which are broken down further into small "labs" of approximately 16 examiners who will work in a similar area of technology. The training program is conducted over a period of 8 months in a location outside of the Technology Centers.

The program courses are taught through a combination of large lectures and small group sessions within the individual labs. The curriculum is kept current by a committee, with representation from every Technology Center, that writes and reviews the substance of the curriculum.

Lectures are followed by practical application and testing. The results of ongoing testing, administered electronically, indicate to examiners how well they grasp a particular topic and provide the trainer with information as to whether segments of the topic need additional review. Examiners write Office actions that are reviewed and evaluated by the trainer who provides appropriate feedback. A proficiency test is administered at the end of the 8-month program. The intent of the program is to deliver, to the examining corps, new hires who are capable of writing complete Office actions for supervisory review.

Mr. Chairman, we were honored to have Chairman Conyers address a graduating class of examiners last month. I would like to take this opportunity to extend an invitation to you and ranking member Coble to do so as well in the near future. I know our new examiners will appreciate hearing about intellectual property matters from the folks who actually write the IP laws.

### 8. Examiner Certification and Recertification

The USPTO has implemented a thorough certification process for any patent examiner seeking to be promoted from the GS-12 level to the GS-13 level. This process includes a review of the work product of the examiner and a certification exam modeled upon the patent bar exam that patent attorneys and agents must pass.

Examiners are provided with legal education on fundamental concepts involving patent laws and procedures to assist them in the preparation of taking the certification exam. Patent law and evidence courses, coaching lectures and on-line Study Tool for Examination Preparation (STEP) are offered to the examiners as training preparation tools.

The promotion to GS-13 represents a level of independence in which the supervisor is no longer responsible for day-to-day intensive review of the examiner's work product. In order for the examiner to achieve this level of independence, we are ensuring that they have the skills required to perform their job requirements with a high level of quality.

We are pleased to note that the percentage of examiners passing the certification test has increased from 44.4% in fiscal year 2004 to 65.9% in fiscal year 2007.

An in-depth review of the work of primary examiners is conducted after three years to ensure that primary examiners maintain the knowledge, skills and abilities necessary to perform high quality examinations. This review is conducted in part by the Technology Center and in part by the Office of Patent Quality Assurance (OPQA). Over the past three years, approximately 95% of primary examiners have passed recertification.

### 9. Patent Reviews

Our Office of Patent Quality Assurance (OPQA) has implemented targeted reviews of examination processes or functions that are perceived to potentially be problematic trends. These reviews provide a means to validate the accuracy and magnitude of the most significant examination process complaints, to establish a baseline of current performance in the targeted area as well as a basis to establish performance targets for improvement plans.

The reviews are conducted on a sample designed to provide statistically valid data and yield an assessment of the current level of performance and the supporting review data with respect to the identified examination process or function. Based on input on potential areas for consideration obtained through customer satisfaction survey data and other input from applicants and practitioners, the areas of final rejection practice, Request for Continued Examination (RCE) practice, search quality and restriction practice were identified for review during FY 07. Fiscal year review findings are summarized at the Corps and TC levels and OPQA consults with the Technology Centers to develop and/or implement improvement plans, as appropriate.

In October 2006, OPQA instituted an in-depth analysis of the search quality in applications selected from specific Art Units within each Technology Center in order to positively identify root-cause problems related to search quality and to identify and share best practices. Art Units subject to review were selected by the Technology Centers on the basis of perceived need, taking into account the findings of quality assurance programs in place within the Technology Centers and the OPQA.

Based upon the review findings, training tailored to the specific needs and technical subject matter of the individual Art Units is developed and delivered to the unit in an interactive format. Training is a collaborative effort between OPQA, Technology Center managers and search experts from the Scientific and Technical Information Center and covers topics including search strategy, claim interpretation, search tools and effective search techniques.

### 10. Expanded Technical Training Program

The USPTO has expanded the range of eligible non-duty training courses available for examiners to enhance their technical skills and abilities. A similar "After Work

7

Exhibit 1
Page 7

Education" (AWE) program is currently being implemented for technical support personnel.

While the USPTO has provided paid non-duty training in the past to patent examiners to enable them to take technical classes, often leading to an advanced degree, it was determined that the previous program was too restrictive. In response to an explicit need expressed by the examiners, amendments were made to broaden the program to provide examiners with one year of experience at the USPTO the ability to take classes in arts outside their immediate docket. The classes, however, must still be related to a recognized technology that is examined at the USPTO.

This program will assist in developing and maintaining a highly skilled workforce by enhancing the employees' knowledge, skills and abilities through formal education. Currently, the patent examiner can receive up to $5,000 per year, and the agency has proposed to raise that opportunity to $10,000 per year.

## Patent Initiatives - Administrative and Regulatory

The USPTO believes that improvements in patent quality are dependent, to a significant degree, on providing examiners access to more and better-focused information relevant to their decision making. Accordingly, the USPTO has promulgated and proposed, and will develop and propose, regulations and administrative changes governing submission and examination of patent applications that will enable our examiners to make more efficient and informed patentability determinations.

1. **Accelerated Examination**

The USPTO has established procedures setting forth requirements for patent applicants who want, within 12 months, a final decision by the examiner on whether their application for a patent will be granted or denied. To be eligible for "accelerated examination," applicants who file under this procedure are required to provide specific information so that review of the application can be completed rapidly and accurately.

Applicants have a duty to disclose to the USPTO material prior art of which they are aware. Under the USPTO's accelerated examination procedure, applicants are required to conduct a search of the prior art, to submit all prior art that is closest to their invention, and explain what the prior art teaches and how their invention is different.

In addition to providing and explaining any prior art references, applicants must explicitly state how their invention is useful and must show how the written description supports the claimed invention. The procedure also limits the number of claims allowed in each application and shortens the time periods for responding to most USPTO communications.

The accelerated examination procedure is designed to give applicants quality patents in less time. In exchange for a more rapid examination, patent examiners receive more focused and detailed information about the invention and the closest prior art from the applicants. This increased disclosure upfront by applicants helps examiners more efficiently make the correct decision about whether a claimed invention deserves a patent within the 12-month timeframe.

The accelerated examination program has been in effect since August 2006, and the first patent issued under the accelerated examination program (in just 6 months) on March 13, 2007, to Brother Corporation for a printer ink gauge. The patent application was filed on September 29, 2006.

1,096 petitions for accelerated examination have been filed to date with 344 granted and 271 pending. Of the 344 granted petitions, 114 have been allowed and 73 will have issued as patents by the end of this month. Our 12-month to completed prosecution (final rejection, allowance or abandonment) goal has been met for all applications.

### 2. Peer Review Pilot

On June 7, 2007, the USPTO released details of a pilot project that could help expedite and improve the examination process in computer technologies. The Peer Review Pilot gives technical experts in computer technology, for the first time, the opportunity to submit annotated technical references relevant to the claims of a published patent application before an examiner reviews it.

When patent examiners have the best information in front of them, they are more likely to make the correct decision. Examiners, however, have a limited amount of time to find and properly consider the most relevant information. This is particularly true in the software-related technologies where code is not easily accessible and is often not dated or well documented.

The pilot is a joint initiative with the Community Patent Review Project (CPRP), organized by the New York Law School's Institute for Information and Policy. The pilot began on June 15, 2007, and runs for one year.

Technical experts in the computer arts registering with the CPRP website review and submit information for up to 250 published patent applications. To ensure a broad cross section of computer technology is reviewed, no more than 15 applications are allowed from any one person or organization.

Existing law allows USPTO to accept prior art from the public, but it doesn't allow the public to submit any commentary related to the art without the approval of the applicant. Thus, consent is obtained from all applicants who volunteer their applications for this pilot.

To expedite review of applications used in the pilot, they are assigned to an examiner as soon as a submission is received from the CPRP. This will shorten the time it normally takes in the computer arts from filing an application to a final decision. Only one

submission from the CPRP of up to 10 annotated references are accepted for each application in the pilot.

To date, 57 applications have been volunteered to participate in this pilot from over 15 different corporations and independent inventors. Over 170 pieces of prior art have been submitted to the 45 applications that have published so far in the pilot.

This pilot is just one facet of USPTO's broader efforts to find new ways to get the best information in front of examiners before they make a final decision on a patent application.

### 3. Markush Claims

On August 10, 2007, the USPTO proposed new rules in the *Federal Register* that will improve an examiner's ability to focus the examination process for individual claims listing multiple independent and distinct inventions in the alternative. Such "multi-invention alternative" claims are especially prevalent in the pharmaceutical, chemical, and biotechnology fields. The rules would permit the examiner to focus examination to a single invention. The rules would also encourage applicants to identify, with more specificity, the claimed invention to be examined, thus promoting examination quality.

### 4. Information Disclosure Statements

On July 10, 2006, the USPTO published proposed rule changes to information disclosure statement (IDS) requirements and other related matters to improve the quality and efficiency of the examination process. The proposed changes will enable the examiner to focus on the relevant portions of submitted information at the very beginning of the examination process, give higher quality first actions, and minimize wasted steps.

Patent applicants and their attorneys or agents currently have an obligation to inform USPTO's patent examiners of all information known to be material to patentability of the invention claimed by the applicant. Applicants list information for the examiner to consider in a communication called an Information Disclosure Statement (IDS).

The USPTO has observed that applicants sometimes provide information in a way that hinders, rather than helps, timely and accurate examination. For example, some applicants send a very large number of documents to the examiner, without identifying why they have been submitted, thus tending to obscure the most relevant information. Additionally, some applicants send very long documents without pointing out what part of the document makes it relevant to the claimed invention. Sometimes applicants delay sending key information to the examiner. These practices make it extremely difficult for the patent examiner to find and properly consider the most relevant information in the limited time available for examination of an application.

The USPTO's proposed rule change is designed to encourage early submission of relevant information, and to discourage submission of information that is unimportant or does not add something new for the examiner to consider. With the proposed changes,

patent examiners would not have to review documents that do not directly relate to the claimed invention, or that duplicate other information already submitted.

Under the proposal, applicants would still be able to send in as many documents as they choose. However, there would be more stringent requirements for those choosing to submit large numbers of documents or very long documents.

### 5. Open Source as Prior Art

The USPTO is consulting with the Open Source community regarding the potential development of a tagging process and interface to enable examiners access to open source software repositories as a source of prior art.

This initiative would classify and develop a lexicon for open source repositories, or databases, so that examiners could readily search them for relevant prior art. Currently, these repositories represent a body of prior art that examiners cannot access due to the inability to apply conventional text searching techniques. In other words, in this art, different inventors use a wide variety of terms to mean the same thing, making text searching very difficult.

### 6. Electronic Filing and Processing

The USPTO continues to promote electronic filing and processing of patent applications as a means of reducing paper-based inefficiencies. The USPTO implemented the Electronic Filing System-Web (EFS-Web), a user-friendly, secure, Internet-based patent application and document submission program in March 2006. Prior to FY 2006, less than 2% of patent applications were filed electronically. After working with the public and introducing the much-improved EFS-Web system, 49.3% of patent applications were filed electronically in FY 2007. In FY08, approximately 70% of patent applications are being filed electronically.

Improvements in EFS-Web have increased the quality of submissions received by the Office, and created significant cost savings for applicants as well as the Office. The trend toward improved processing and examination efficiency will continue as EFS-Web is being integrated with the evolving Patent File Wrapper (PFW) system to allow for a fully automated, text-driven patent application processing life-cycle. Our outreach efforts to our stakeholders are focused on further promoting electronic filing and interaction with patent applicants.

Operating in today's wired world requires that the USPTO have full electronic processing that is safe, secure and continually available to employees, applicants and stakeholders. EFS-Web has been a successful step in achieving that goal.

### 7. Central Reexamination Unit (CRU)

Reexamination cases, formerly distributed to the Technology Centers and assigned to examiners according to technology, are now assigned to a Central Reexamination Unit (CRU). The CRU consists of 52 highly skilled primary examiners who have a full understanding of reexamination practice and are generalists in their field of technology and relevant case law, and concentrate solely on reexamination.

The CRU is comprised of three art units including mechanical, electrical and chemical technology. The units are supervised by Supervisory Patent Examiners (SPEs) and each action is conferenced by a panel of three including the lead examiner, one SPE/RQAS/TQAS and one other CRU examiner. The goal of the CRU is to close prosecution on all ex-parte reexaminations within two years of filing.

### 8. Pre-Appeal Conferences

In July 2005, the USPTO announced that patent applicants can request a pre-appeal brief conference and learn its results before incurring the costs of drafting and filing an appeal brief. This change is expected to save patent applicants at least $30 million annually.

Previously, when an applicant wished to appeal a patent examiner's rejection of his/her patent application to the Board of Patent Appeals and Interferences (BPAI), the applicant was required to file a notice of appeal and an appeal brief before proceeding to the BPAI. Depending on the complexity of the invention, appeal briefs cost between $5,000 and $20,000 to prepare.

Before the appeal goes to the BPAI docket, however, the agency holds a pre-appeal brief conference with the examiner handling the application and two other experienced examiners. The purpose of the conference is to determine if the application is ready for appeal. Under the new procedures, an appeal brief isn't filed until the outcome of the conference is known. If the case is not ready for appeal, applicants will no longer incur the costs associated with needlessly preparing and filing the appeal brief.

### 9. Pre-First Office Action Interview and First Action Interview

**Pre-First Office Action Interview**

This initiative involves conducting a pre-first Office action interview with the applicant or his/her designated legal representative to discuss potential prior art rejections and possibly resolve many or all issues with respect to patentability. MPEP 713.02 provides for interviews prior to the first official action which will form the basis of reminders and encouragement to examiners regarding this provision. The MPEP makes clear that these interviews are at the discretion of the examiner who has yet to search the invention and a showing by the applicant may be required to justify the interview. In addition, the Office is currently in the process of setting up teleconferencing facilities to pilot such interviews when face-to-face meetings are not feasible and/or convenient.

Interviews occurring before the first Office action are believed to provide the opportunity for a more focused examination at the earliest stages of prosecution. Pendency of

applications that are part of this initiative will be tracked with the expectation that closure will be reached sooner due to the increased communication and discussion of issues taking place earlier in the process. We strongly encourage applicants to take advantage of this opportunity.

**First-Action Interview**

This initiative is a pilot program in which the applicant is entitled to a first action interview, upon request, prior to the first Office action on the merits. Under this pilot, the examiner will conduct a prior art search and provide applicant with a condensed pre-interview Office action. Within 30 days of its receipt, the applicant must schedule an interview and submit proposed amendments and/or arguments. At the interview, the rejections and proposed amendments will be discussed. If agreement is not reached, the applicant will receive a cursory first action interview Office action coupled with an interview summary that will act as the first Office action on the merits under 35 USC 132.

Interviews early in an application's prosecution allow for a speedy resolution of any unresolved issues. This, coupled with reduced applicant periods for response under the pilot, should reduce total pendency for the applications examined under this initiative.

Currently, the Official Gazette Notice and POPA agreement are undergoing final vetting. It is expected that the pilot will be implemented in March or April of 2008.

### 10. Work Sharing

The USPTO continues to work with the world's major intellectual property offices to study, review and implement work-sharing efforts that promote examination efficiencies in each participating office. The USPTO launched a trial cooperation program with the Japan Patent Office (JPO) in FY 2006 to leverage fast-track patent examination procedures already available in both offices to obtain corresponding patents faster and more efficiently. It also permits each office to benefit from work previously done by the other office.

This program, the Patent Prosecution Highway (PPH), is a significant first step in cooperative efforts to support U.S. and Japanese industries in their global patent prosecution activities and represents the first concrete implementation of a work-sharing arrangement between the USPTO and the JPO.

The USPTO is expanding on this work-sharing program with other intellectual property offices, initially with the United Kingdom, Korea and Canada. The USPTO will continue its efforts in expanding this program and will develop a coordinated approach among the offices in order to streamline practices and procedures.

### 11. Outreach

The USPTO with the help of its Patent Public Advisory Committee (PPAC) is reaching out to the intellectual property community to seek their input on improvements to the patent system in all areas including, but not limited to, examination, prosecution, enforcement and levels of patenting. Through the PPAC, we anticipate an open dialogue with patent stakeholders and the public as to what the Office needs to do to best protect and encourage innovation in America. We are open to all possibilities from minor improvements to a dramatic overhaul of patent protection, if justified. We are looking at a wide variety of alternative examination procedures including those that can be implemented under existing authorities as well as those requiring statutory changes.

The USPTO is also partnering with a local university's graduate school of business to participate in an international competition among graduate business students to create a business plan to address the USPTO's patent backlog and pendency challenges.

### Patent Initiatives - Legislative

The USPTO is pleased that proposed patent modernization legislation includes quality-related provisions that will help ensure that patent examination is focused on the most relevant information available. Having such information available to patent examiners at the early stages of the examination process will lead to quality and efficiency improvements. The legislative proposals are consistent with the wide range of USPTO administrative initiatives directed toward those goals.

1. **Applicant Quality Submissions (AQS)**

A critical element of ensuring that patent examinations are of the highest quality and completed as efficiently as possible is the content of the initial application. The patent applicant has the most knowledge, the most opportunity, and the most to gain by providing the USPTO with the best possible information about his or her invention.

The Senate bill (S. 1145), as reported, directs the USPTO to issue regulations requiring applicants to submit search reports and analysis and other information relevant to patentability. The regulations would govern the timing and content of these submissions. Further, the bill provides that "micro-entities" as defined in the pending legislation are exempt from the requirements of this section.

The USPTO fully endorses the proposed AQS legislative language in the Senate bill, which is consistent with language originally recommended by the Office.

Policymakers would also need to consider how the current doctrine of inequitable conduct may discourage applicants from fully and fairly sharing relevant information with the USPTO. The USPTO is working with Congress on language in the patent modernization legislation that would encourage applicants to share more information with the Office.

2. **Public Quality Submissions**

Consistent with the USPTO's efforts to improve examiners' access to relevant information, pending patent modernization legislation would establish a procedure to permit submission by any person in writing of prior art within six months after publication of an application for patent. It would provide a limited opportunity for the public to have prior art documents considered by an examiner in the examination of an application. Any submission would necessarily include a "concise description of the asserted relevance of each submitted document."

Current USPTO rules permit documents to be submitted within 2 months after publication but without any explanation of relevance.

The USPTO supports this proposal with some technical adjustment and the addition of related rulemaking authority by the USPTO Director.

### 3. Post-Grant Review

Consistent with USPTO recommendations, pending patent modernization legislation includes provisions to establish new post-grant review procedures at the USPTO. The provisions are intended to improve upon existing administrative reexamination alternatives and provide a quicker, lower cost alternative to expensive litigation in reviewing patent validity questions. Such procedures would complement rather than displace ongoing quality-focused initiatives at USPTO.

The USPTO has suggested to Congress that the legislation, as currently drafted, be revised to more closely align with the post-grant review proposal drafted by the USPTO.

The USPTO proposal and both pending bills establish a post-grant review procedure under which any person may request the USPTO to cancel as unpatentable any claim of a patent within 12 months after issue or reissue. While the House and Senate bills vary as to a second window of opportunity for challenging a patent, the USPTO supports establishment of a second window that would open for a period of six months after a petitioner receives notice from a patent holder alleging infringement and shows substantial economic impact.

## Trademark Initiatives

The Trademark organization met all of its production and pendency goals for FY 2007. Trademark first action pendency was 2.9 months and final action pendency, excluding suspended and inter partes proceedings, was 13.4 months.

### 1. Telework

The Trademark organization's telework programs continue to be a model for the Federal government. 85% of eligible examining attorneys work from home and, in fact, 85% of

all eligible trademark employees participate in a work-at-home program. The attrition rate for trademark examining attorneys was 2.5% in FY 2007.

### 2. Office of Trademark Quality Review and Training (OTQRT)

In FY 2003, the Trademark Quality Office (TQO) was recast as the Office of Trademark Quality Review and Training (OTQRT) with expanded authorities and responsibilities. While the TQO was responsible for measuring the quality of work product and maintenance of relevant data, the OTQRT is now responsible for the analysis of the quality data, identification of quality concerns and development of training initiatives designed to address those concerns. The Office continues to work with management to improve quality rather than merely perform measurements.

OTQRT review applications within strict time periods that ensure that corrective action can and does take place -- the current process is not only an in-process review, but allows for an in-process correction where appropriate.

Training initiatives that reflect the quality data and analysis are implemented in two main areas -- in continuing legal and procedural education and through new employee (primarily new examining attorney) training.

### 3. Outreach

The Office continues to invite members of the outside Trademark bar to provide industry specific lectures on trademark topics. Further, the Office has partnered with the International Trademark Association to jointly develop and present annual training seminars on particular industries. Recent seminars have focused on the fashion and retail, food and beverage, and motor vehicle industries.

The Office also arranges for speakers on a variety of current trademark issues and works with the International Trademark Association on a legal lecture series for examining attorneys. For example, recent topics have included anti-counterfeiting, ethics, and perspectives on examination from the point-of-view of private trademark counsel. Also, the Office meets with user groups on an ongoing basis to obtain feedback on examination quality.

### 4. Examining Attorney Training Time

Examining Attorneys are permitted to use up to 40 hours per year to attend training that directly enhances their ability to perform their duties as Examining Attorneys.

### Protection of Intellectual Property

With increased demand for countries to implement effective systems for IP rights enforcement to achieve their World Trade Organization (WTO) and Trade Related Aspects of Intellectual Property Rights (TRIPs) obligations, and comply with existing

and new bilateral/multilateral trade agreement commitments, the USPTO continues to focus on providing technical training and capacity-building programs for IP rights protection and enforcement, judicial and prosecutorial education, public education and awareness efforts, and capacity-building to support the needs of developing countries. While the USPTO has long provided IP rights assistance and training, the USPTO has developed a flexible team approach to meet the challenges of IP rights protection and enforcement in today's global environment. This effort is accomplished by fulfilling existing obligations to assist nations in implementing accessible and effective IP rights protection and enforcement systems; partnering to provide useful programs and training; and working to increase the accessibility, efficiency, and effectiveness of civil, administrative, and criminal enforcement mechanisms in global trade, foreign markets, and electronic commerce.

### 1. Posting of IP Experts Overseas

In partnership with the Department of Commerce's U.S. and Foreign Commercial Service and the Department of State, the USPTO has posted IP experts in selected, high profile countries where U.S. IP challenges are greatest. The USPTO has posted experts in the countries of Brazil, India, Thailand, China (three experts), Egypt and Russia. The experts advocate U.S. IP policy and interests, conduct training on IP rights matters, assist U.S. businesses and otherwise support the Embassy or Consulate action plan on IP rights.

### 2. Global Intellectual Property Academy (GIPA)

The USPTO established GIPA, which consolidates and greatly expands USPTO's curriculum of training and capacity building programs on IP rights protection and enforcement. Through GIPA, USPTO brings foreign government officials including judges, prosecutors, police, Customs officers, patent, trademark and copyright officials, and policy makers to the United States to learn, discuss and strategize about global IP rights protection and enforcement. GIPA programs cover the gamut of IP rights enforcement issues facing the global economy, and are offered by USPTO acting in close cooperation with other U.S. Federal government agencies.

With the establishment of the Academy, the USPTO also implemented a Foreign Examiners-in-Residence (FEIR) training program – the first of its kind in international cooperation and training at the USPTO. Selected examiners from the patent offices in China, India, Brazil, Egypt, Mexico, and the Philippines participated in an 8-month pilot training program. The pilot is being evaluated to determine whether to continue the FEIR program.

### 3. Training and Capacity Building

In the near future (FY 2009 and beyond), the USPTO plans to strengthen our efforts to improve domestic and international IP protection. Project activities under this initiative will include the development and implementation of a series of enforcement programs including a world-wide program, regional programs, programs designed for single country participation and topic specific programs; increase the level of partnering and

resource matching with other government agencies, intergovernmental organizations, international organizations, and foreign international IP offices. An increase in bilateral activities between the USPTO and other foreign governments including consultations on the implementation and effectiveness of enforcement provisions is anticipated.

### 4. Free Trade Agreements (FTAs)

The negotiation of FTAs with trading partners is an essential mechanism for strengthening protection of U.S. interests abroad. The USPTO actively works with the USTR to develop standardized text for the IP section of FTAs, as well as advises the USTR during negotiation and implementation efforts. Additionally, technical assistance for FTA implementation would be provided. In FY 2007, the USPTO led the negotiations for the IP Chapter of the U.S.-Korea FTA, which is arguably the strongest IP chapter in any FTA and the most commercially significant FTA agreement in over 15 years. The USPTO also participated in negotiations on the IP chapter of the U.S.-Malaysia FTA, and negotiations and implementation of the U.S.-Central American FTA with the Dominican Republic. The USPTO will continue to support USTR in FTA negotiations, as scheduled.

### 5. IP Public Awareness Program

The USPTO holds conferences for small- and medium-sized businesses where participants learn about the importance of IP rights and how to protect and enforce these rights. In FY 2007, the USPTO formed a partnership with the U.S. Chamber of Commerce enabling the USPTO to share duties of agenda-building, funding, and outreach. Events were held in Raleigh, Detroit, Burlington (Vermont), San Antonio, Portland (Oregon), Seattle, Denver, and Los Angeles. The USPTO also organized two China specific events that took place in Philadelphia and Kansas City (Missouri). Large companies presented "lessons learned" and "best practices" to small-business attendees and small-businesses discussed the importance of their IP protection. More than 1,300 small- and medium-sized businesses attended. As a new outreach and educational tool, the USPTO distributed more than 1,500 CDs on IP protection. The USPTO will continue to hold small-business outreach seminars. Also in FY 2007, the USPTO began a partnership with the Ad Council to reach young Americans through a national ad campaign called *Inspiring Invention*, which seeks to make inventing and developing new ideas part of children's lives. Radio and television commercials are now playing throughout the country with the message, "Anything's possible. Keep thinking."

### 6. STOP!

The USPTO is fully engaged in the Bush Administration's Strategy Targeting Organized Piracy (STOP!) in the fight against piracy and counterfeiting around the world. In addition to training and outreach efforts, USPTO IP attorneys continue to staff the STOP! Hotline, which lets callers receive information on IP rights and enforcement from our attorneys with regional and subject matter expertise.

### Conclusion

Intellectual property rights are a critical aspect of how nations protect and promote innovation and global competitiveness. The United States represents the gold standard for intellectual property protection, and the USPTO is the most productive and most respected intellectual property office in the world. However, because intellectual property protection is so fundamental to our Nation's economic growth, being the best is not enough. We must approach perfection. Despite the challenges, we at the USPTO strive to get it perfect, and we look forward to working with the Subcommittee to ensure that we do.

Thank you.